**SOUTH BEND COMMUNITY SCHOOL CORPORATION,**
Appellant–Employer,

v.

**Linda D. LUCAS, Appellee–Claimant.**

No. 93A02–0705–EX–387.

Court of Appeals of Indiana.

Feb. 19, 2008.

Alison G. Fox, Amy M. Steketee, Baker & Daniels LLP, South Bend, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-employer South Bend Community School Corporation (South Bend) appeals the decision of the Unemployment Insurance Review Board (the Board) awarding unemployment insurance benefits to appellee-claimant Linda D. Lucas. South Bend argues that the Board erroneously determined that the Head Start Consortium of Elkhart and St. Joseph Counties (Head Start) is not an educational

institution within the meaning of the relevant statute such that Lucas is eligible for unemployment insurance during the summer breaks between Head Start's academic terms. Concluding that the legislature intended for Head Start to be treated as an educational institution, we reverse the decision of the Board.

## FACTS [1]

Lucas is employed as a teacher with Head Start, which is a federally-funded program designed to help children of low-income families prepare for kindergarten. The program operates annually from August until June. On June 9, 2006, Lucas received a letter "extending a reasonable assurance that continued employment would be available ... in the same or similar capacity after the conclusion of the summer break." Appellant's App. p. 1. Lucas filed for unemployment insurance benefits during her 2006 summer break from employment with Head Start. On August 30, 2006, a claims deputy concluded that Lucas is ineligible for unemployment insurance because she was "separated from employment at an educational institution during an established and customary recess." Id. at 30. Lucas appealed, and on February 13, 2007, the ALJ affirmed the claims deputy's determination that Lucas was not eligible for benefits.

Lucas appealed the ALJ's decision to the Board, and on April 12, 2007, the Board reversed, determining that Lucas was, in fact, eligible for unemployment benefits. Among other things, the Board found as follows:

> The [Head Start] curriculum includes working with children to develop their social skills and interaction with their peers and adults, rudimentary language and mathematical skills such as identification of ten letters of the alphabet and familiarization with shapes, and programs designed to increase parents' child observation skills and preparing their children for school. The stated long-term goals of the Head Start Consortium include

> (1) ensuring school readiness; (2) galvanizing rich community resources to improve the health and social outcomes for children and their families; (3) strengthen the program based on the assets and participation of Head Start families and communities; (4) empower parents to develop self-sufficiency; and (5) provide equally high quality services in both Elkhart and St. Joseph Counties.

The Head Start program follows an academic calendar, but the Employer conceded that it is not a "school" as defined by Indiana Code § 22–4–2–37....

## CONCLUSIONS OF LAW:

\* \* \*

... The Review Board interprets the meaning of "educational institution" as used in Indiana Code § 22–4–14–7 to include both schools and institutions of higher education. The Employer conceded that it was not a school; the Head Start Consortium is obviously not an institution of higher learning. To adopt the Employer's argument that anytime an entity provides educational or instructional services the entity qualifies as an educational institution invites an interpretation of the statute that the Review Board does not believe the Legislature intended.

Contrary to the [ALJ's] findings, the Head Start program clearly does not

---

1. We heard oral argument on January 7, 2008, in Indianapolis. We thank counsel for their able written and oral presentations.

meet the definition for a "school," because it is a federal program that is not accredited by the Indiana state board of education nor does it allow for progression from grades one through twelve....

*Id.* at 1–2 (citations and footnotes omitted). South Bend now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

This case turns on an issue of statutory interpretation. A panel of this court has explained the way in which we review the interpretation of a statute by an agency charged with its enforcement:

> When our [S]upreme [C]ourt has had to directly decide the question of the correctness of an agency's interpretation of a statute, it has held, "the interpretation of a statute by the administrative agency charged with its enforcement is entitled to great weight." *Natural Res. Com'n of Indiana Dep't of Natural Res. v. Porter County Drainage Bd.,* 576 N.E.2d 587, 589 (Ind.1991). This holding is reflected in many other cases. *See, e.g., LTV Steel Co. v. Griffin,* 730 N.E.2d 1251, 1257 (Ind.2000); *Indiana Wholesale Wine & Liquor Co. v. State ex rel. Indiana Alcoholic Beverage Comm'n,* 695 N.E.2d 99, 105 (Ind.1998); *Sullivan v. Day,* 681 N.E.2d 713, 716 (Ind.1997); *Shaffer[v. State,* 795 N.E.2d 1072, 1076 (Ind.Ct.App.2003) ]; *State Employees' Appeals Comm'n v. Barclay,* 695 N.E.2d 957, 959–60 (Ind.Ct.App.1998) (deferring to SEAC's interpretation of Indiana Code Section 11–10–5–4), *trans. denied.*

Deference to an agency's interpretation of a statute becomes a consideration when a statute is ambiguous and sus-

ceptible of more than one reasonable interpretation. *See Shaffer,* 795 N.E.2d at 1076. "When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency." *Id.* (citing *Sullivan,* 681 N.E.2d at 716). If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation. *Id.* "Terminating the analysis recognizes 'the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations.'" *Id.* at 1077 (quoting *Indiana Wholesale Wine & Liquor,* 695 N.E.2d at 105). *State v. Young,* 855 N.E.2d 329, 335 (Ind. Ct.App.2006). We have emphasized, however, that "[w]here [an agency's interpretation] is unreasonable, or where it is inconsistent with the statute itself, we will, of course, accord it no deference." *Higgins v. State,* 855 N.E.2d 338, 342 (Ind.Ct. App.2006) (internal citation omitted).

### II. Definition of "Educational Institution"

■ The purpose of the Unemployment Act is to provide unemployment benefits to persons unemployed through no fault of their own. Ind.Code § 22–4–1–1. The legislature has statutorily excluded employees of educational institutions from receiving unemployment benefits for periods of unemployment between academic terms by preventing them from drawing against wage credits earned from the educational institution. I.C. § 22–4–14–7(a)(1).[2] The statute does not, however, define "edu-

---

2. In greater detail, the statute sets forth the following exceptions to the general rule of unemployment coverage:

(1) With respect to service performed in an instructional, research, or principal administrative capacity for an educational institu-

cational institution." Other sections of the Article define "postsecondary educational institutions," I.C. § 22–4–2–31, and "school," I.C. § 22–4–2–37, as educational institutions. The Board, therefore, concluded that "educational institution" refers only to the two terms defined elsewhere as educational institutions-schools and institutions of higher education.

Because Head Start is obviously not an institution of higher education, the Board focused its inquiry on whether Head Start qualifies as a "school" pursuant to Indiana Code section 22–4–2–37:

"school" means an educational institution that is accredited and approved by the Indiana state board of education and is an academic school system, whereby a student may progressively advance, starting with the first grade through the twelfth grade. This includes all accredited public and parochial schools which are primary, secondary, or preparatory schools. "School" does not include:

(1) a kindergarten, not a part of the public or parochial school system;

(2) a day care center;

(3) an organization furnishing psychiatric care and treatment;

(4) an organization furnishing training or rehabilitation for individuals with mental retardation or a physical disability, which organization is not a part of the public or parochial school system; or

(5) an organization offering preschool training, not a part of the public or parochial school system.

tion, benefits may not be paid based on the service for any week of unemployment commencing during the period between two (2) successive academic years, or terms, or during the period between two (2) regular but not successive terms, or during a period of paid sabbatical leave provided for in the individual's contract, to any individual if the individual performs the services in the first of the academic years or terms and if there is a reasonable assurance that the individual will perform services in an instructional, research, or principal administrative capacity for any educational institution in the second of the academic years or terms.

(2) With respect to services performed in any capacity (other than those listed in subdivision (1) of this section) for an educational institution, benefits may not be paid based on the service of an individual for any week which commences during a period between two (2) successive academic years or terms if the individual performs the service in the first of the academic years or terms and there is reasonable assurance that the individual will perform the service in the second of the academic years or terms. However, with respect to weeks of unemployment beginning on or after January 1, 1984, if compensation is denied to any individual under this subdivision and the individual was not offered an opportunity to perform such services for the educational institution for the second of the academic years or terms, the individual is entitled to a retroactive payment of compensation for each week for which the individual filed a timely claim for compensation and for which compensation was denied solely by reason of this subdivision.

(3) With respect to any services described in subdivisions (1) or (2) of this section, compensation payable for these services shall be denied to any individual for any week which commences during an established and customary vacation period or holiday recess if there is reasonable assurance that the individual will perform the services in the period immediately following the vacation period or holiday recess.

(4) With respect to any services described in subdivisions (1) and (2), benefits shall not be payable on the basis of services in any such capacities as specified in subdivisions (1), (2), and (3) to any individual who performed such services in an educational institution while in the employ of an educational service agency. For purposes of this subdivision, the term "educational service agency" means a governmental agency or governmental entity that is established and operated exclusively for the purpose of providing such services to one (1) or more educational institutions.

The Board concluded that a kindergarten preparation program is not an institution whereby a student may progressively advance from the first through the twelfth grade. In examining the list of entities that are explicitly not schools, the Board found that Head Start most closely meets the fifth exclusion.

South Bend argues that the Board's definition of "educational institution" is overly narrow. It suggests that we apply the general rule, which is "that undefined words in a statute are given their plain, ordinary, and usual meaning." *Ind. State Univ. v. Rev. Bd. of Ind. Dept. of Workforce Dev.*, 868 N.E.2d 839, 843 (Ind.Ct. App.2007). To that end, South Bend directs our attention to dictionary definitions of the relevant terms. *See Black's Law Dictionary* 532 (7th ed.1999) (defining "educational institution" as "[a] school, seminary, college, university, or other educational facility, though not necessarily a chartered institution"); *id.* at 1346 (defining "school" as "[a]n institution of learning and education, esp[ecially] for children"); *Ballentine's Law Dictionary* 390 (3rd ed.1969) (defining "educational institution" as "[a]n institution for the teaching and improvement of its students or pupils; a school, seminary, college or university . . . ."); *id.* at 640 (defining "institution" as "[s]omething that has been established, particularly a place where an educational or charitable enterprise is conducted").

■ Keeping in mind the statutory definition of "school" and the dictionary definitions of "educational institution," we turn to the specifics of the Head Start program in discerning the intent of the General Assembly. Head Start is a public entity established pursuant to an agreement between twelve public school corporations. It is governed by a Board of Directors comprised of the superintendents of the twelve participating school corporations.

South Bend is Head Start's fiscal agent, meaning that it oversees fiscal operations and human resource management. Head Start teachers provide instruction in classrooms located inside member elementary schools and work side-by-side with teachers of students in other grades to create a seamless transition for students.

Head Start's mission is "to create a seamless educational system for underserved preschool children, and to provide a nurturing learning environment to prepare them for kindergarten." Appellant's App. p. 48. To accomplish this mission, Head Start uses a structured multidisciplinary curriculum that is grounded in educational research and includes a detailed framework for measuring outcomes. *Id.* at 17, 50–53. Head Start relies on teachers who are responsible for, among other things, developing lesson plans, instructing and supervising students in accordance with lesson plans and Head Start policies, monitoring student progress, and communicating student achievement to parents. Additionally, Head Start operates on a calendar year with regularly scheduled vacation periods and a summer break between academic terms.

In other words, Head Start is a consortium of twelve undisputedly educational institutions. It operates in educational institutions and its academic calendar is identical to that of the schools responsible for its operation. It has a structured curriculum that is taught by teachers. Before the scheduled summer breaks, Head Start gives its teachers reasonable assurance that they will return to their jobs when the new academic year begins in the fall. And perhaps most compelling, although Head Start teachers do not receive a salary during the summer breaks, their health insurance coverage *does* continue unabated through those months. Inasmuch as Head Start is virtually identical to a school and

is inextricably intertwined with the member public school corporations, we can only conclude that the legislature intended that Head Start be treated as an educational institution for the purpose of unemployment compensation.

Adding further support to this conclusion is the purpose of the Unemployment Act, which is "to enable unfortunate employees who become and remain involuntarily unemployed by adverse business and industrial conditions, to subsist on a reasonably decent level...." *Stanrail Corp. v. Rev. Bd. of Dept. of Workforce Dev.*, 735 N.E.2d 1197, 1202 (Ind.Ct.App.2000). When interpreting the legislature's decision to exclude employees of educational institutions from receiving unemployment benefits on their scheduled breaks, a panel of this court has noted that "the reason for the statutory disqualification is that the legislature[ ] did not intend to subsidize teachers during their summer vacation periods." *Fort Wayne Cmty. Schs. v. Rev. Bd. of Ind. Emp. Sec. Div.*, 428 N.E.2d 1379, 1383 (Ind.Ct.App.1981).

Here, as noted above, Head Start teachers work on an academic calendar. Summer breaks between terms are scheduled well in advance and allow teachers to plan other activities, including alternate employment, for that time. When Lucas applied for unemployment benefits in the summer of 2006, she knew that she would return to work in August. There is no evidence that she was involuntarily underemployed by adverse business conditions. Thus, South Bend argues that

> [a]llowing Ms. Lucas to receive unemployment benefits during her summer vacations would vitiate rather than buttress the purpose of the Unemployment Compensation Act because she—and every other teacher (and teaching assistant) at the Head Start Consortium—could receive a windfall each summer

while not working during a planned vacation period. Like public school teachers, Head Start Consortium teachers (who receive medical insurance and other benefits through the summer), know well in advance when the summer break begins and may seek employment for that period.

Appellant's Br. p. 18.

█ The Board points out that there is no evidence that Lucas had income other than unemployment benefits during the summer at issue, but we agree with South Bend—the windfall consists of the eligibility for, not the receipt of, unemployment benefits. "A teacher who desires summer employment has the entire school year to secure work for the summer months. If the teacher knows he or she is eligible for unemployment compensation during summer months ..., there is little incentive for him or her to use the school year to vigorously pursue summer employment." Reply Br. at 7–8 n. 5. Given the purpose of the Unemployment Act and the way in which Head Start is structured and operated, we can only conclude that the legislature intended that Head Start be treated as an educational institution for the purpose of unemployment compensation. Thus, the Board's decision was contrary to legislative intent and necessarily unreasonable.

The judgment of the Board is reversed.

SHARPNACK, J. concurs.

RILEY, J., dissents with opinion.

Judge, RILEY, dissenting with separate opinion.

I respectfully dissent from the majority's conclusion characterizing Head Start as an educational institution pursuant to Ind.Code § 22–4–2–37. Indiana Code section 22–4–2–37 determines "school" to be

an educational institution that is accredited and approved by the Indiana state board of education and is an academic school system, whereby a student may progressively advance, starting with the first grade through the twelfth grade. This includes all accredited public and parochial schools which are primary, secondary, or preparatory schools. "School" does not include:

(1) a kindergarten, not a part of the public or parochial school system;

(2) a day care center;

(3) an organization furnishing psychiatric care and treatment;

(4) an organization furnishing training or rehabilitation for individuals with mental retardation or physical disability, which organization is not a part of the public or parochial school system; or

(5) an organization offering preschool training, not a part of the public or parochial school system.

Mindful of this statutory language, we first note that, unlike Indiana's public schools which are funded through local property taxes, Head Start is a public entity entirely funded through federal grants. The program is not accredited by the Indiana State Board and its overall curriculum is subject to federal guidelines.

Furthermore, Head Start's curriculum is focused on a multidisciplinary approach and intends to instill its young students with a mastery of certain skills, educational and otherwise, prior to entering kindergarten. While designed as a pre-school program, it serves primarily economically disadvantaged children, ages three to five, and attempts to enhance the children's potential to succeed in school by providing development services to meet their intellectual, social, and health needs. Besides ensuring school readiness, as the majority points out, Head Start's goals are much broader and even encompass "the partic-ipation of Head Start's families and communities." Op. p. 31. As such, I believe the educational aspect of the program to be incidental to its primary purpose of bringing the children to a level of social development where they are better equipped to deal with the environment of the traditional school.

In light of the evidence before us, I remind the majority of its quoted standard of review that "[w]hen a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency." Op. p. 32 (quoting *Shaffer v. State,* 795 N.E.2d 1072, 1076 (Ind.Ct.App.2003)). Based on the numerous differences that exist between the Head Start program—not in the least its funding and accreditation—and what is customarily regarded as a school, the Board reasonably and consistently interpreted the statute by excluding Head Start as an educational institution. Accordingly, by disregarding its own standard, I believe the majority reached the wrong result. I would affirm the Board's decision in all regards.